IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

| | | |
|---|---|---|
| COREY LEWIS COLEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM DANFORTH, Warden, Telfair | ) | |
| State Prison; SAM ZANDERS, Deputy | ) | |
| Warden, Telfair State Prison; LT. RODNEY | ) | CV 316-095 |
| MCCLOUD, Unit Manager, Telfair State | ) | |
| Prison; LIEUTENANT WILCOX, Telfair | ) | |
| State Prison, SERGEANT JORDAN- | ) | |
| THOMAS, Telfair State Prison; SERGEANT | ) | |
| TAYLOR, Telfair State Prison; OFFICER | ) | |
| BELL, Cert. Officer, Telfair State Prison; | ) | |
| JILL CRAVEY, Nurse, Telfair State Prison; | ) | |
| and DR. CHANEY, Telfair State Prison, | ) | |
| | ) | |
| Defendants. | ) | |

_____

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
_____

*Pro se* Plaintiff, a former inmate at Telfair State Prison ("TSP"), commenced this case

pursuant to 42 U.S.C. § 1983. Before the Court are cross motions for summary judgment

regarding Plaintiff's Eighth Amendment claims for failure to protect and denial of medical care,

his First Amendment retaliatory transfer claim, and his Fourteenth Amendment due process

claim. The Court **REPORTS** and **RECOMMENDS** Defendants' motion for summary

judgment be **GRANTED IN PART** (doc. no. 142), resulting in dismissal of all but the failure to

protect claim, and Plaintiff's motion for summary judgment be **DENIED** (doc. no. 146).

## I.     FACTS

### A.     Plaintiff's Description of Assault and Forced Transfer on July 15, 2013

Giving rise to Plaintiff's claim for failure to protect is his assault and forced transport to administrative segregation on July 15, 2013.  The Court draws Plaintiff's description of these events from his deposition and specified portions of the amended complaint incorporated by reference into his sworn summary judgment declaration.  (Doc. no. 147.) While the Court does not approve of such incorporation, it will consider the incorporated allegations to comply with its duty to construe liberally *pro se* filings.

TSP inmate Richard Harris is an imam, or Muslim prayer leader, who ordered Muslim inmates to assault and forcibly transport Plaintiff to administrative segregation from the cafeteria during a Ramadan iftar meal on July 15, 2013.  (Am. Compl., doc. no. 44, ¶¶ 1, 4.)  Harris ordered the assault because of a rumor Plaintiff was planning to stab him, and Plaintiff's objection to Harris authorizing Muslim inmates to rob others.  (Doc. no. 158-1, Pl.'s Dep. at 58, l. 16-23.)  At Harris's instruction, an inmate approached Plaintiff while he was eating and struck him across the upper chest and back with a wooden walking cane. (Am. Compl. ¶ 5; Pl.'s Dep. at 55, l. 9-12.)  Several inmates joined in, punching and kicking Plaintiff in the head, chest, and ribs before Plaintiff escaped outside.  (Am. Compl. ¶ 5; Pl.'s Dep. at 55, l. 13-19.)   There were sixty to seventy inmates in the cafeteria and three correctional officers, including Defendants Wilcox and Bell.  (Pl.'s Dep. at 56-57, l. 5-14.)

Outside the cafeteria, a large group of inmates stood near Plaintiff to protect him from five or six attacking inmates.  (Id. at p. 66, l. 5-23.)  The standoff lasted a couple of minutes, during which time "[t]he CERT team and the lieutenant, they're watching and they're trying

to figure out what's going on or is it going to escalate any further." (Id. at 67, l. 22-25.) Plaintiff asked officers for permission to go to his dormitory. (Id. at 68, l. 2-7.) Instead, Defendants Bell, Taylor, and Wilcox, along with Officer Daniels, opened a series of gates allowing additional inmates access to Plaintiff and opening a pathway to E building where Harris had ordered Plaintiff transported. (Am. Compl. ¶¶ 9, 11; Pl.'s Dep. at 68, l. 2 – 70, l. 21.) Inmates punched Plaintiff and threatened him with shanks, saying, "'You're going to the compound dead or alive . . . .'" (Id. at 71, l. 17-25.) Plaintiff managed to escape and run to the gate near his dormitory, where Officers Daniels and Livingston opened the gate and allowed Plaintiff and two other inmates to pass. (Id. at 74, l. 3-8.) Plaintiff tried to enter his dormitory, but a voice on the radio he believes to be Defendant Wilcox instructed officers not to open the door. (Id. at 74, l. 18.)

Harris led inmates and officers across the yard to subdue Plaintiff. (Am. Compl. ¶ 14; Pl.'s Dep. at 75, l. 8-24.) When Plaintiff implored Defendant Wilcox for help, he responded, "'One officer just got killed for not minding his own business, we let each religion and gang affiliation handle their own people and business.'" (Am. Compl. ¶ 15; Pl.'s Dep. at 76, l. 14-17.) Defendant Wilcox opened another security gate, allowing eight to ten inmates to rush in, beat Plaintiff, and slam him to the ground. (Am. Compl. ¶ 16-17.) Plaintiff claims the assailants broke his clavicle, and he "lost consciousness momentarily for a second." (Pl.'s Dep. at 39, l. 12-16; 77, l. 11-16.)

After binding Plaintiff's arms and legs with belts, inmates carried and dragged Plaintiff to the E-2 dormitory. (Am. Compl. ¶¶ 18, 20-21; Pl.'s Dep. at 77, l. 18-24; 78 l. 1.) Along the way, Defendant Wilcox threatened to spray Plaintiff with tear gas. (Am. Compl. ¶

3

19; Pl.'s Dep. at 78, l. 24 – 79, l. 2.)   By the time officers placed Plaintiff in E building, blood was "covering" Plaintiff and his "arm [was] dangling down." (Pl.s' Dep. at 80, l. 13-14.)  Officer Tucker, the deputy warden of security, arrived and mocked Plaintiff alongside the inmates.  (Id. at 80, l. 17-19.)  Within five minutes of Plaintiff's arrival, a radio call rallied the group of inmates and seven to eight officers to leave E building and forcibly transport a second inmate, William Gipson, to an E building shower stall at the direction of Defendant Deputy Warden Zanders.  (Id. at 80, l. 20 – 81, l. 10.)

In addition to emotional distress, Plaintiff alleges he suffered as a broken clavicle, a minor cut to his mouth, "cherry burns" caused by dragging, lacerations on his head, chest, and back from the cane strikes and punches, a large bruise on his chest from the cane strikes, and a pulled muscle in his lower back.  (Pl.'s Dep. at 86, l. 10 – 91, l. 24.)  Plaintiff heard the clavicle bone crack, and his roommate later told Plaintiff he could "see some of the bone kind of protruding." (Id. at 40.)  Plaintiff also contends he could not lift his shoulder from the moment of the fracture.  (Id. at 38, l. 17-23.)

Plaintiff alleges his assault and forced transport occurred because of a policy at TSP authorizing each faction of inmates to discipline their own people, with the express knowledge and assistance of prison officials.  In support of this accusation, Plaintiff cites two events unrelated to the July 15, 2013 incident and three related events.  First, in June 2013, ten Muslim inmates obeyed Harris's command to remove Plaintiff from D building to B building and place him "in the hole," where he remained for seventeen days until Harris authorized prison officials to release him.  (Id. at 62, l. 6 – 64, l. 8.)  Second, on numerous occasions, Plaintiff has observed inmate groups carry inmates from dormitories to lockdown

4

areas, and unidentified officers on unspecified occasions explained such events as follows: "'Hey, that's not my business,' 'You handle your own' or 'Ya'll handle ya'll's own people . . .'" (Id. at 64, l. 26 - 65, l. 1-7.)

Third, immediately before the assault began in the cafeteria on July 15, 2013, the first assailant spoke with an unspecified lieutenant in the cafeteria who did nothing in response to the assault. (Id. at 65, l. 8-19.) Fourth, as described previously, Defendant Wilcox explained he would not intervene to protect Plaintiff because of a prison policy to "'let each religion and gang affiliation handle their own people and business.'" (Am. Compl. ¶ 15; Pl.'s Dep. at 76, l. 14-17.) Fifth, Plaintiff alleges Harris visited him on August 4, 2013, three weeks after the assault, and claimed the authority to order Plaintiff's immediate release from administrative segregation if he agreed to Harris's terms and conditions. (Pl.'s Dep. at 93, l. 23 – 95, l. 24.) Plaintiff refused the offer. (Id.)

B.    **Defense Perspective of Events on July 15, 2013**

Defendants' summary judgment briefs avoid a discussion of the events on July 15, 2013, and Defendants do not seek a summary judgment ruling concerning whether their actions and omissions on that day violated Plaintiff's constitutional rights. Nor do they submit testimony refuting Plaintiff's allegation of a policy and custom ceding disciplinary authority to inmate factions. Instead, they claim entitlement to qualified immunity, arguing Plaintiff's constitutional right to intervention and protection was not clearly established.

Defendants did submit, however, a video recorded by Defendant Bell. (DVD, doc. no. 149; see also doc. no. 146-3, p. 90.) The video opens in the yard outside D building to an intense scene of inmates mingling and yelling while several chase Plaintiff and attempt to

5

subdue him.  There are approximately ten to fifteen inmates involved in the chase while approximately ten inmates gather on the outside of the chain link fence surrounding the yard. One correctional officer is inside the yard, and Defendant Bell is on the outside of the fence, such that the approximate ratio of inmates to guards in the proximity is twenty-five to two.

Plaintiff, donning a white cap, alternately argues with and evades the inmates. Eventually, inmates grab Plaintiff and wrestle him to the ground while more inmates secure Plaintiff and carry him toward E building.  The inmates appear to use the least force necessary to overcome Plaintiff's resistance and carry him, and at no point is there any visible punching or stabbing.  As the group approaches the gate exiting the yard outside D building, three correctional officers arrive and walk alongside the group carrying Plaintiff. Once through the gate, inmates place Plaintiff inside a room in E building.  Plaintiff argues with one inmate.  An inmate enters the room with Plaintiff, and correctional officers remove this inmate and lock Plaintiff inside the room.

Plaintiff submitted a Georgia Department of Corrections ("GDC") memorandum detailing interview statements of prison personnel and inmates, including Plaintiff and Defendants.  (Doc. no. 146-3, at 70-80.)  Defendants do not rely on these interview statements.

### C.    Placement in Administrative Segregation

Plaintiff avers that, following his forced transport, two officers placed him in E-2 dormitory, administrative segregation cell #123, with inmate William Gipson.  (Am. Compl. ¶ 29.)  Plaintiff was not given any warning, notification, or hearing, and no prison official ever explained why Plaintiff was placed there.  (Pl.'s Decl. Opp. ¶ 8; Pl.'s Dep. at 93, l. 23 –

6

94, l. 2.) Cell #123 is "a concrete small closet size dungeon" containing a locker, light fixture, two bed frames, a toilet, and a sink. (Am. Compl. ¶ 30.) It contains no desk, electrical outlet, or panic button, and the door and window are covered with steel plates. (Id.) While housed there, Plaintiff was unable to attend video Islamic worship and study services or participate in congregational prayers or Ramadan. (Id. ¶ 35.) Plaintiff contends Defendants Danforth, Zanders, and McCloud "were aware that plaintiff was attacked, assaulted, and kidnapped," and "were responsible for reviewing administrative decisions" and failed "to rectify or take any appropriate action." (Id. ¶¶ 33-34; Pl.'s Decl. Opp. ¶ 10.) Plaintiff claims to have suffered mental anguish and emotional distress. (Am. Compl. ¶ 31; Pl.'s Decl. Opp. ¶ 9.)

Plaintiff alleges Harris orchestrated his placement in administrative segregation, and he disagrees with Defendants' contention the purpose of segregation was protective custody, explaining, "I never once requested protective custody. I never had a reason to be in protective custody." (Pl.'s Dep. at 93, l. 4-14.) He further testified Harris visited him in administrative segregation on August 4 and lectured Plaintiff as follows: "Do not question my authority. I run this prison. You know I can get you out of the hole. Stop having your family contact the warden and the commissioner's office. Stop filing grievances. And just play your role, and you can come out. And I can get you out today." (Id. at 93, l. 23 – 95, l. 24.) Plaintiff did not agree to these conditions and remained in segregation. (Id. at 96, l. 2-3.)

Defendants counter they placed Plaintiff in administrative segregation for protective custody rather than punishment, pending investigation of the assault and transport. (Danforth

Aff., doc. no. 134-4, ¶ 8; doc. no. 143-5, p. 20.) Defendant Wilcox authorized the placement on July 16, 2013, and Defendant Zanders approved it the next day. (Danforth Aff. ¶ 8; doc. no. 143-5, pp. 18, 20.) On July 18, 2013, a Classification Committee consisting of three non-parties conducted an administrative segregation hearing. (Danforth Aff. ¶ 8; doc. no. 143-5, p. 19.) Although given the opportunity, Plaintiff did not request an advocate, call any witnesses, or present any evidence or argument. (McCloud Aff. ¶ 8; Danforth Aff. ¶ 10; doc. no. 143-5, p. 19.) The Classification Committee recommended protective custody because the investigation was still pending. (Danforth Aff. ¶ 10; doc. no. 143-5, p. 19.) Defendant Danforth approved the recommendation on July 22, 2017. (Id.) Defendants Zanders and McCloud were not involved in the hearing or approval. (Zanders Aff. ¶ 7; McCloud Aff. ¶ 5.) Plaintiff remained in protective custody from July 15, 2013 until his transfer on August 9, 2013. (McCloud Aff. ¶ 10.)

Inmates housed in administrative segregation live in cells that are similarly ventilated, lighted, furnished, and maintained in comparison to the general population. (Id. ¶ 11.) Though a metal plate is placed over the cell's window, the plate allows air flow. (Id.) Inmates shower at least three times per week and have access to medical care. (Id.; Pl.'s Dep. at 101-02.) They are allowed visitation, correspondence, and law library privileges and have access to the same food, bedding supplies, counselor services, and commissary as the general population. (McCloud Aff. ¶ 11; Pl.'s Dep. at 96.) Inmates may exercise five hours per week outside their cells unless security or safety concerns dictate otherwise. (McCloud Aff. ¶ 11.) Finally, while inmates in administrative segregation may not attend religious services, they may practice religion in their cells. (Id.)

**D.    Medical Treatment**

Plaintiff avers that, on July 22, 2013, he attended a medical callout for his injuries from the assault, and Defendant Nurse Cravey issued ibuprofen but refused to examine his broken clavicle, take his vital signs, or dress his lacerations. (Am. Compl. ¶ 37; Pl.'s Decl. Opp. ¶ 11.) Nurse Cravey avers Plaintiff only complained of back pain and soreness in his right shoulder and right knee. (Cravey Aff., doc. no. 143-6, ¶ 7; doc. no. 143-2, p. 2.) Upon examination, Plaintiff exhibited normal vital signs, full range of motion in his shoulder, knee, and back, no bruising, lacerations, swelling, or deformities, and no signs of a fractured shoulder. (Cravey Aff., doc. no. 143-6, ¶ 7; doc. no. 143-2, p. 2.)

According to Plaintiff, Defendant Dr. Chaney and Nurse Cravey examined him on August 8, 2013, and Dr. Chaney told Plaintiff his right shoulder bone was broken and protruding but inexplicably failed to order an x-ray or MRI or provide any other treatment. (Am. Compl. ¶ 47; Pl.'s Decl. Opp. ¶ 15.) Dr. Chaney recalls Plaintiff complaining of tenderness in the distal clavicle of the AC joint and claiming it was an old injury for which he was due surgery because he had completed physical therapy. (Id.) Upon examination, Plaintiff walked normally and exhibited no spasms, swelling, deformities, bruising, tenderness, or hypoesthesia, which was inconsistent with his complaints of back numbness and spasms. (Id.) Dr. Chaney assessed Plaintiff with an abnormal right shoulder AC joint, found his subjective low back complaints unsupported by objective presentation, and determined no further treatment was needed. (Id.) Plaintiff became angry and informed Dr. Chaney he would appeal to the Composite Medical Board. (Id.) Reviewing Plaintiff's chart after the appointment, Dr. Chaney did not find any reference to pending shoulder surgery but

did find a history of abnormal right AC joint.  (Chaney Aff. ¶ 10.)  Dr. Chaney thus sent

Plaintiff a note indicating surgical evaluation was available but does not recall whether

Plaintiff expressed interest.  (Id.; doc. no. 143-2, p. 1.)

Plaintiff's medical records reveal a history of right shoulder abnormalities.  A 2012 x-

ray revealed "widening of the AC joint which is suggestive of possible previous resection of

the distal tip of the clavicle."  (Doc. no. 143-2, p. 9.)  Plaintiff's medical records after the

assault include notation of the AC joint abnormality during intake at Georgia Diagnostic and

Classification Prison ("GDCP"), an x-ray revealing the absence of the distal clavicle with no

acute dislocation or joint disease, and a February 2014 surgical opinion the condition did not

require surgery or physical therapy.   (Id. at 5; Burnside Aff., doc. no. 145-3, ¶¶ 5, 10; doc.

no. 143-2, pp. 4, 8.)

E.     **Transfer from TSP**

Plaintiff filed Grievance 153188 on July 17, 2013, alleging failure to protect during

the assault and transport.  Twelve days later, Plaintiff alleges correctional officers searched

his cell and one officer stated, "This is what happen [sic] when y'all file grievances and have

family calling the Warden."  (Am. Compl. ¶ 41; Pl.'s Decl. Opp. ¶ 12.)  On July 31, 2013,

before two Inmate Affairs investigators interviewed Plaintiff regarding the incident,

Defendant Danforth stated, "You've caused enough problems and trouble already, watch

what you say in there or I'll transfer you somewhere worser [sic] than here."  (Am. Compl. ¶

42; Pl.'s Decl. Opp. ¶ 13.)   Nine days later, on August 9, 2013, Defendant Danforth

transferred Plaintiff from TSP to GDCP, and Plaintiff alleges the transfer was in retaliation

for him complaining about the July 15th incident.  (Am. Compl. ¶ 52.)

Defendant Danforth avers that, on July 16, 2013, Plaintiff's counselor requested the transfer because Plaintiff was too familiar with the local area and staff and had been involved in two incidents with Muslim inmates in the past sixty days. (Danforth Aff. ¶ 11; doc. no. 143-5, pp. 5-6.) While Defendant Danforth does not recall the request, the transfer form shows he initially denied but later approved the transfer on July 22, 2013. (Id.) Defendant Danforth avers he approved the transfer for safety and security because Plaintiff had been involved in two incidents with Muslim inmates in the past month. (Danforth Aff. ¶ 12.) Because Defendant Danforth could not make the final transfer decision, Steve Upton, GDC Deputy Director of Facilities, ultimately approved the transfer. (Id.; doc. no. 143-5, p. 10.)

Defendant Danforth was not aware Plaintiff submitted Grievance 873182 on July 17, 2013. (Danforth Aff. ¶ 13.) Defendant Danforth initiated the investigation for which Plaintiff was interviewed on July 31, 2013, based in part on a letter from Plaintiff complaining about the incident, and he denies ever threatening Plaintiff. (Id. ¶¶ 16-17; doc. no. 143-5, p. 21.) By the time of Plaintiff's interview on July 31, 2013, Defendant Danforth had already approved Plaintiff's transfer. (Danforth Aff. ¶ 17; doc. no. 143-5, p. 5.)

## II.  DISCUSSION

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (*en banc*). On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial. Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Id. at 608. The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981). Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (quoting Adickes, 398 U.S. at 158-59). A genuine dispute as to a material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

**A.** **Trial of the Failure to Protect Claim Is Necessary Because the Evidence, Viewed Most Favorably to Plaintiff, Shows Defendants Refused to Intervene In Accordance with a TSP Custom of Ceding Disciplinary Authority to Inmate Factions**

Defendants do not argue the undisputed facts show no constitutional violation occurred when they decided not to intervene. Instead, they assert qualified immunity and contend the undisputed facts show their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. To understand why summary judgment is inappropriate, one must understand the Eighth Amendment duty to protect, as well as the qualified immunity analysis at summary judgment.

### 1. Eighth Amendment

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 828 (1994) (citations omitted). To establish such a claim, a prisoner "must allege facts sufficient to show (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Lane v. Philbin, 835 F.3d 1302, 1307 (11th Cir. 2016) (internal quotations omitted). These three elements are evaluated in part by an objective standard and in part by a subjective standard. Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014). As the Eleventh Circuit explained,

> When examining the first element—a substantial risk of serious harm—the court uses an objective standard. The second element—the defendant's deliberate indifference to that risk—has two components: one subjective and one objective. To satisfy the subjective component, a plaintiff must produce evidence that the defendant actually (subjectively) kn[ew] that an inmate [faced] a substantial risk of serious harm. To satisfy the objective component, a plaintiff must produce evidence that the defendant disregard[ed] that known risk by failing to respond to it in an (objectively) reasonable manner.

Id. (internal citations and quotations omitted).

The Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." Farmer, 511 U.S. at 833; see also Harmon v. Berry, 728 F.2d 1407, 1409 (11th Cir. 1984) (*per curiam*) ("Prisoners have a constitutional right to be protected from violence while in custody."). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." Farmer, 511 U.S. at 834. Merely negligent failure to protect does not justify liability. Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990). "Prison officials must have been deliberately indifferent to a known danger before we can say that their failure to intervene offended 'evolving standards of decency,' thereby rising to the level of a constitutional tort." Id. (citing Estelle v. Gamble, 429 U.S. 97, 105-06 (1976)); see also Murphy v. Turpin, 159 F. App'x 945, 948 (11th Cir. 2005) (applying deliberate indifference standard to claim prison official failed to intervene in inmate assault).

For liability to attach, prison officials must have been in a position to intervene. Terry v. Bailey, 376 F. App'x 894, 896 (11th Cir. 2010). The officer is only liable if he "was physically able and had a realistic chance to intervene and act in time to protect the inmate plaintiff." Glispy v. Raymond, No. 06–14269–CIV, 2009 WL 2762636, at *3 (S.D. Fla. 2009). The plaintiff has the burden of demonstrating the defendant was in a position to intervene but failed to do so. Ledlow v. Givens, 500 F. App'x 910, 914 (11th Cir. 2012). Furthermore, "no rule of constitutional law requires unarmed officials to endanger their own

safety in order to protect a prison inmate threatened with physical violence." Seals v. Marcus, No. 1:11-CV-99 WLS, 2013 WL 656873, at *8 (M.D. Ga. Jan. 25, 2013), report and recommendation adopted, No. 1:11-CV-99 WLS, 2013 WL 663579 (M.D. Ga. Feb. 22, 2013); see also Prosser v. Ross, 70 F.3d 1005, 1008 (8th Cir. 1995) ("[P]rison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm."); Winfield v. Bass, 106 F.3d 525, 532 (4th Cir. 1997) ("[A]ll of the authority of which we are aware leads to the conclusion that such heroic measures are not constitutionally required.").

### 2.    Qualified Immunity

The doctrine of qualified immunity protects government officials, acting pursuant to their discretionary authority, "'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); Townsend v. Jefferson County, 601 F.3d 1152, 1157 (11th Cir. 2010). For an official's acts to be within his or her discretionary authority, they must be "(1) undertaken pursuant to the performance of [his or her] duties and (2) within the scope of [his or her] authority." Jones v. City of Atlanta, 192 F. App'x 894, 897 (11th Cir. 2006) (punctuation omitted) (quoting Lenz v. Winburn, 51 F.3d 1540, 1545 (11th Cir. 1995)). If the defendant was acting within his or her discretionary authority, "the plaintiff must show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Townsend, 601 F.3d at 1158

(punctuation omitted) (quoting <u>Holloman ex. rel. Holloman v. Harland</u>, 370 F.3d 1252, 1264 (11th Cir. 2004)).

"A right is clearly established if, in light of already-existing law, the unlawfulness of the conduct is apparent, and if a constitutional rule applies with obvious clarity to give an official fair warning that violating that right is actionable." <u>Bennett v. Hendrix</u>, 423 F.3d 1247, 1255 (11th Cir. 2005) (internal citations omitted). "If reasonable public officials could differ on the lawfulness of a defendant's actions, the defendant is entitled to qualified immunity." <u>Storck v. City of Coral Springs</u>, 354 F.3d 1307, 1314 (11th Cir. 2003). Also, the Eleventh Circuit has held: "In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decision of the United States Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." <u>Jenkins v. Talladega City Bd. of Educ.</u>, 115 F.3d 821, 826 n.4 (11th Cir. 1997).

The determination of "whether a constitutional right was clearly established 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1349-50 (11th Cir. 2002) (quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001)). Factually similar cases from the relevant jurisdictions may be material to this determination, though prior cases need not demonstrate the unlawfulness of the challenged conduct in the exact same factual circumstance for qualified immunity to be overcome. <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002). Rather, the issue here is whether the state of the law as of July 2013 gave Defendants fair warning failing to intervene in the assault on Plaintiff was unconstitutional. <u>See</u> <u>id.</u> at 741.

### 3. Analysis

Regardless of what version of events the jury chooses, it is clear Defendants undertook all relevant acts and omissions while performing their official duties within the scope of their authority. Accordingly, Plaintiff "must demonstrate that a reasonable jury could interpret the evidence in the record as showing that the defendant violated a constitutional right that was clearly established at the time of the acts in question." Harland, 370 F.3d at 1267. Plaintiff has made this demonstration.

Viewing the evidence favorably to Plaintiff, reasonable jurors could find (1) a custom and practice at TSP of allowing inmate factions to discipline their own members; and (2) compliance with that custom and practice when prison officials did not intervene and protect Plaintiff during his assault and forced transport. Not only does Plaintiff testify to the existence of this custom and practice, but he alleges Defendant Wilcox cited this custom and practice as the reason he would not intervene during the assault and forced transport. Reasonable jurors could also find support for Plaintiff's allegations in the video footage, which shows no action by TSP officers to stop the assault and transport and, at times, the appearance of cooperation and assistance. If a jury accepts this view of the evidence, reasonable public officials could not differ regarding the lawlessness of Defendants' custom and practice or their actions and omissions on July 15, 2013. Indeed, any practice or custom of ceding disciplinary authority to inmate factions and refusing to intervene when a faction attacks an inmate violates the victim's longstanding and clear constitutional right to intervention and protection.

Importantly, however, the jury may believe a reasonable, alternate version of the facts that would entitle Defendants to qualified immunity. As the Eleventh Circuit has explained, "the 'facts', as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case," and "a district court, at a trial, can 'use special verdicts or written interrogatories to the jury to resolve disputed facts before the judge rules on the qualified immunity question.'" Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 926 (11th Cir. 2000).

Every description of the events on July 15, 2013, from every source including Plaintiff, establish an entire group of Muslim inmates decided Plaintiff needed to be extricated immediately from the general prison population. Aside from the struggle to gain control of Plaintiff for the transport, the video does not depict the inmates beating Plaintiff or otherwise attempting to cause him serious injury. Several prison guards observe these events closely and follow the mob as they carry Plaintiff. Reasonable jurors could find Defendants reasonably reacted to a prison disturbance with appropriate restraint by accommodating the Muslim group's demands while closely observing Plaintiff to ensure he was not physically harmed. If jurors determined these facts to be true, it could not be said Plaintiff possessed a clearly established right to intervention and protection by Defendants. On the contrary, Defendants would have a clearly established right to exercise a broad swath of discretion in determining the appropriate response to this prison disturbance.

In the context of discussing allegations of excessive force in the quelling of an uprising, the Supreme Court has explained as follows:

In making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used. As we said in *Hudson v. Palmer,* 468 U.S. 517, 526–527, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984), prison administrators are charged with the responsibility of ensuring the safety of the prison staff, administrative personnel, and visitors, as well as the "obligation to take reasonable measures to guarantee the safety of the inmates themselves." In this setting, a deliberate indifference standard does not adequately capture the importance of such competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance.

Where a prison security measure is undertaken to resolve a disturbance, such as occurred in this case, that indisputably poses significant risks to the safety of inmates and prison staff, we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Johnson v. Glick,* 481 F.2d 1028, 1033 (CA2) (Friendly, J.), cert. denied *sub nom. John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

Whitley v. Albers, 475 U.S. 312, 320–21 (1986).

Six years later, the Supreme Court reiterated the importance of providing prison officials with considerable discretion to decide the appropriate response to a prison disturbance, as follows:

Whether the prison disturbance is a riot or a lesser disruption, corrections officers must balance the need "to maintain or restore discipline" through force against the risk of injury to inmates. Both situations may require prison officials to act quickly and decisively. Likewise, both implicate the principle that " '[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.' " 475 U.S., at 321–322, 106 S.Ct., at 1085 (quoting *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979)).

Hudson v. McMillian, 503 U.S. 1, 5–7 (1992).

Undoubtedly because the most common response to a prison disturbance is overwhelming and immediate counterattack, one can find with relative ease decisions considering an inmate's claim of injury caused by excessive force of prison officials quelling a disturbance. Courts considering the constitutional boundaries of force in this context typically dismiss the inmate's claim, finding as a matter of law the force applied fell within the officers' considerable discretion. See, e.g. Whitley, 475 U.S. at 322-24 (affirming directed verdict in favor of prison official who shot inmate in leg during quelling of prison riot, despite conflicting testimony concerning whether force was excessive, because wanton conduct is not established by negligence or ordinary errors of judgment).

Exceedingly rare, however, is the claim by an inmate that prison officials should have acted more quickly and aggressively to quell a disturbance in which the inmate was injured when assaulted by other inmates. Indeed, the Court could find no decision regarding such a claim by the U.S. Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court. Furthermore, there appears to be only one such decision from a court within the Eleventh Circuit, and the court therein granted summary judgment to the prison officials because there was no duty to intervene. See Jacoby v. Jones, 2:15CV382, 2018 WL 4137083 (M.D. Ala. July 30, 2018) (granting summary judgment to prison officials on claim they failed to intervene when plaintiff was assaulted during prison uprising, finding officers acted reasonably and not with deliberate indifference when six responded to quell riot and remainder waited in lobby until prison was under control). As one might surmise, the Court also could not find any decision holding an inmate has a constitutional right to intervention

when a mob of inmates declare their intent to remove him to administrative segregation and do so, under the watchful eyes of outmanned prison officials, in a manner that does not cause serious injury.

Accordingly, the qualified immunity question depends on whether jurors find Defendants (1) adopted a custom and practice permitting inmate factions to discipline their own members and, in accordance therewith, refused to intervene and protect Plaintiff; or (2) reasonably decided to monitor a prison disturbance rather than intervene with force. The Court will not engage in an individualized analysis of qualified immunity because Defendants' qualified immunity argument is generalized and not specific to each defendant.

### B. Plaintiff's Injuries, While Sufficient to Satisfy § 1997e(e), Are *De Minimis* and Underserving of Anything More than Nominal Damages

Defendants argue they are entitled to summary judgment on Plaintiff's failure to protect claim for the additional reason no reasonable juror could find Plaintiff suffered any injury from the assault and forced transport. (Doc. no. 143-11, p. 9.) Alternately, they argue Plaintiff is only entitled to nominal damages because his injuries were at most *de minimis*. (Id. at 9-13.) While reasonable jurors could differ regarding whether Plaintiff suffered any injury, Plaintiff cannot recover more than nominal damages because no reasonable juror could find his injuries were more than *de minimis*.

Section § 1997e(e) provides, in pertinent part, as follows: "No federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." Thus, the Prison Litigation Reform Act prohibits

federal civil actions by prisoners alleging purely mental or emotional injury and no physical injury. Mitchell v. Brown & Williamson Tobacco Corp., 294 F.3d 1309, 1312-13 (11th Cir. 2002). To survive application of the § 1997e(e) bar, the physical injury must be more than *de minimis*. Id. at 1213. "The meaning of the phrase 'greater than *de minimis*,' however, is far from clear." Chatham v. Adcock, 334 F. App'x 281, 284 (11th Cir. 2009).

While Plaintiff claims he suffered numerous severe injuries including a fractured shoulder, medical records show (1) he did not seek medical assistance until July 22, one week after the incident; and (2) his only injuries were soreness in his shoulder, knee, and back, and a minor laceration to his mouth that healed within a few weeks. In addition, medical records in the months preceding and succeeding the incident confirm Plaintiff had long suffered from a chronic shoulder condition for which he consistently complained of pain. Furthermore, while Plaintiff claims the assault broke his shoulder and rendered it immobile immediately, (Pl.'s Dep. at 38, l. 17-23), the claim is directly contradicted by video footage of his movements after his transport to E building. "Self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records." Whitehead v. Burnside, 403 F. App'x 401, 403 (11th Cir. 2010). The Court finds Plaintiff's injuries were, at most, *de minimis,* and his self-serving statements of more severe injuries do not create a question of fact. Accordingly, Plaintiff's recovery of damages at trial shall be limited to nominal damages, and summary judgment is proper with respect to his claims for compensatory and punitive damages.

**C.** **Plaintiff's Due Process Claim Fails Because No Reasonable Juror Could Find the Conditions of Administrative Segregation Imposed Atypical and Significant Hardships**

Prisoners have "no constitutionally protected liberty interest in being classified at a certain security level or housed in a certain prison." Kramer v. Donald, 286 F. App'x 674, 676 (11th Cir. 2008); see also Meachum v. Fano, 427 U.S. 215, 223-24 (1976) (finding no liberty interest in transfer to less agreeable prison). However, a prisoner has a protected liberty interest that is violated by placement in punitive segregation when the placement "will inevitably affect the duration of his sentence" or "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484, 486 (1995). Because there is no evidence to suggest the former, the Court focuses on the latter "atypical and significant hardship" requirement.

"It is plain that the transfer of an inmate to less amenable and more restrictive quarters for non-punitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." Al-Amin v. Donald, 165 F. App'x 733, 738 (11th Cir. 2006) (citing Hewitt v. Helms, 459 U.S. 460, 468 (1983), *modified on other grounds*, Sandin, 515 U.S. at 481); see also Chandler v. Baird, 926 F.2d 1057, 1060 (11th Cir. 1991) (stating Due Process Clause does not "create 'an interest in being confined to a general population cell, rather than the more austere and restrictive administrative segregation quarters.'" (citation omitted)). Thus, the Court must consider whether the deprivation of in-prison benefits "impose[s] atypical and significant hardship on [Plaintiff] in relation to the ordinary incidents of prison life." Hill v. Sellars, No. 5:15-CV-00453, 2016 WL 7972197, at *5

(M.D. Ga. Nov. 17, 2016) (citing Sandin, 515 U.S. at 484 and Wilkinson v. Austin, 545 U.S. 209, 223 (2005)), *adopted by*, 2017 WL 343638 (M.D. Ga. Jan. 23, 2017).

Plaintiff complains his administrative segregation cell had no desk, electrical outlet, or panic button, and the door and window were covered with steel plates. He also complains he could not attend video Islamic worship and study services or participate in congregational prayers or Ramadan. These minor inconveniences, endured for only a short duration of July 15, 2013 to August 9, 2013, do not constitute atypical and significant hardships. Indeed, the undisputed facts show the conditions of his administrative segregation were substantially similar to those experienced by the general population of the prison.

Cells in administrative segregation are similarly ventilated, lighted, furnished, and maintained in comparison to the general population. (McCloud Aff. ¶ 11.) Though a metal plate is placed over the cell's window, the plate allows air flow. (Id.) Inmates shower at least three times per week and have access to medical care. (Id.; Pl.'s Dep. at 101-02.) They are allowed visitation, correspondence, and law library privileges and have access to the same food, bedding supplies, counselor services, and commissary as the general population. (McCloud Aff. ¶ 11; Pl.'s Dep. at 96.) Inmates may exercise five hours per week outside their cells unless security or safety concerns dictate otherwise. (McCloud Aff. ¶ 11.) Finally, while inmates in administrative segregation may not attend religious services, they may practice religion in their cells. (Id.)

Any related substantive Due Process claim fails for the same reason, i.e. the absence of an atypical and significant hardship implicating a constitutionally protected liberty interest. See Smith v. Deemer, 641 F. App'x 865, 868-69 (11th Cir. 2016) (holding prisoner

plaintiff failed to state substantive and procedural due process claims regarding conditions of confinement because he did not allege facts sufficient to establish constitutionally protected liberty interest); <u>Hill</u>, 2016 WL 7972197, at *7 (same).

> **D.** **Dismissal of the Retaliatory Transfer Claim Against Defendant Danforth Is Proper Because Plaintiff's Disputes with Muslims Ensured His Transfer Would Have Occurred Even in the Absence of His Complaints About Prison Conditions**

Prisoners do not have a constitutional right to remain at a particular penal institution. <u>Adams v. James</u>, 784 F.2d 1077, 1079 (11th Cir. 1986); <u>Meachum v. Fano</u>, 427 U.S. at 227. However, "[i]t is an established principle of constitutional law that an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement." <u>Smith v. Mosley</u>, 532 F.3d 1270, 1276 (11th Cir. 2008). Consequently, "prison officials may not transfer, or otherwise punish, an inmate in retaliation for exercising his right to file grievances against prison officials." <u>Nichols v. Riley</u>, 141 F. App'x 868, 869 (11th Cir. 2005).

To prevail, a plaintiff must establish the following three elements: "(1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the administrator's allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech." <u>Smith</u>, 532 F.3d at 1276 (citation omitted); <u>see also</u> <u>Moton v. Cowart</u>, 631 F.3d 1337, 1341 (11th Cir. 2011). Under the third element, a plaintiff must establish a defendant was subjectively motivated to discipline him because he complained about a condition of his confinement. <u>Smith</u>, 532 F.3d at 1278. Courts are to resolve the

subjective motivation issue under the burden shifting formula as follows:

> "Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment."

Id. (quoting Thaddeus-X v. Blatter, 175 F.3d 378, 399 (6th Cir. 1999)).

Plaintiff's filing of a grievance regarding conditions of his confinement is constitutionally protected. Nichols, 141 F. App'x at 869. Moreover, "transfers to another prison, or even the threat of a transfer, may constitute a sufficiently adverse consequence to deter a person of ordinary firmness from engaging in protected conduct." Toenniges v. Morales, No. CV 311-083, 2012 WL 3027935, at *9 (S.D. Ga. June 26, 2012), report and recommendation adopted, No. CV 311-083, 2012 WL 3026409 (S.D. Ga. July 24, 2012). Thus, Plaintiff has established the first two elements of his retaliatory transfer claim.

While it is disputed whether Defendant Danforth was subjectively motivated to discipline Plaintiff based on his complaints, Defendant Danforth has clearly established he would have taken the same action in the absence of the protected activity. Defendant Danforth avers Plaintiff's transfer occurred because of safety concerns arising out of two recent encounters between Plaintiff and Muslim inmates. (Danforth Aff. ¶ 12.) The undisputed facts show this reason is valid and not a pretext. Indeed, Plaintiff cannot and does not dispute he had at least two encounters with other Muslim inmates at TSP within the span of two months preceding his transfer. The video footage of an entire Muslim group forcibly removing Plaintiff from their presence certainly supports a finding the transfer was necessary for Plaintiff's safety.

Moreover, it is undisputed Defendant Danforth was neither the initiator nor the ultimate decisionmaker with respect to the transfer request. On July 16, 2013, Plaintiff's counselor requested the transfer, citing Plaintiff's familiarity with the local area and staff and the two incidents with Muslim inmates in the past sixty days. (Danforth Aff. ¶ 11; doc. no. 143-5, pp. 5-6.) Defendant Danforth initially denied the request pending further investigation but later approved it on July 22, 2013, eight days before he allegedly threatened Plaintiff with a transfer on July 31, 2013. (Id.) Because Defendant Danforth could not make the final transfer decision, Steve Upton, GDC Deputy Director of Facilities, ultimately approved the transfer. (Id.; doc. no. 143-5, p. 10.) Because there is a valid, independent, and indisputable reason for Plaintiff's transfer, summary judgment in favor of Defendants is proper.

### E. Nurse Cravey and Dr. Chaney Are Entitled to Summary Judgment Because Plaintiff Had No Serious Medical Need, and They Were Not Deliberately Indifferent to Any Such Need

To establish a claim for deliberate medical indifference, Plaintiff must show: (1) he had a serious medical need – the objective component, (2) a defendant acted with deliberate indifference to that need – the subjective component, and (3) his injury was caused by a defendant's wrongful conduct. Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007); see also Thomas v. Bryant, 614 F.3d 1288, 1317 n.29 (11th Cir. 2010). To satisfy the objective component, a prisoner must show his medical need "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Goebert, 510 F.3d at 1326. To satisfy the subjective component, Plaintiff must show a defendant (1) possessed subjective knowledge

of a risk of serious harm; and (2) disregarded that risk, (3) by conduct that is more than mere

negligence. See Melton v. Abston, 841 F.3d 1207, 1223 (11th Cir. 2016).

Furthermore, "not every claim by a prisoner that he has not received adequate medical

treatment states a violation of the Eighth Amendment." Farrow v. West, 320 F.3d 1235,

1243 (11th Cir. 2003). As the Supreme Court has explained:

> [A]n inadvertent failure to provide medical care cannot be said to constitute
> "an unnecessary and wanton infliction of pain" or to be "repugnant to the
> conscience of mankind." Thus, a complaint that a physician has been
> negligent in diagnosing or treating a medical condition does not state a valid
> claim of medical mistreatment under the Eighth Amendment. Medical
> malpractice does not become a constitutional violation merely because the
> victim is a prisoner. In order to state a cognizable claim, a prisoner must
> allege acts or omissions sufficiently harmful to evidence deliberate
> indifference to serious medical needs.

Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). Thus, mere negligence or malpractice do not

amount to deliberate indifference. Campbell v. Sikes, 169 F.3d 1353, 1363-72 (11th Cir.

1999); Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991). Moreover, the Eleventh

Circuit has consistently held a mere difference of opinion between an inmate and prison

medical officials over a diagnosis or course of treatment does not support a claim of

deliberate indifference. See Smith v. Fla. Dep't of Corr., 375 F. App'x 905, 910 (11th Cir.

2010).

No reasonable juror could find Plaintiff had a serious medical need because, as

explained in § II(B) medical records establish he suffered, at most, minor lacerations and

pain in his shoulder, knee, and back. Such injuries are not "so obvious that even a lay person

would easily recognize the necessity for a doctor's attention." Goebert, 510 F.3d at 1326

(quotations omitted); see also Young v. United States, No. 5:13-CV-609-OC-29PRL, 2015

WL 3605052, at *6 (M.D. Fla. June 8, 2015) ("Generally, other courts addressing bruises and lacerations have concluded that they do *not* constitute an objectively serious medical need.") (emphasis in original) (citations omitted).

Second, no reasonable juror could find Defendants were deliberately indifferent to any medical need of Plaintiff. As the medical records shows, Nurse Cravey carefully examined Plaintiff, provided him ibuprofen for his pain, and referred him to a doctor. (Cravey Aff. ¶ 7; doc. no. 143-2, p. 2; Pl.'s Dep. at 36-37.) Dr. Chaney carefully considered Plaintiff's subjective complaints and objective presentation, then reviewed Plaintiff's medical records after the appointment and referred him for surgical evaluation. (Chaney Aff. ¶ 10; doc. no. 143-2, p. 1.) Defendants' actions did not rise to the level of negligence, much less deliberate indifference. Plaintiff's mere disagreement with the course of treatment cannot establish deliberate indifference. Smith, 375 F. App'x at 910.

### F. Plaintiff's Summary Judgment Motion

Plaintiff seeks summary judgment in his favor with respect to all claims. The Court has considered all of Plaintiff's evidence and arguments above in connection with its recommendations as to Defendants' summary judgment motion, and no additional analysis is necessary here. For the reasons stated above, the Court recommends denial of Plaintiff's summary judgment motion.

## III. CONCLUSION

The Court **REPORTS** and **RECOMMENDS** Plaintiff's motion for summary judgment be **DENIED** (doc. no. 146) and Defendants' motion for summary judgment be **GRANTED IN PART** (doc. no. 142), resulting in summary judgment for Defendants on the Eighth Amendment

claim for denial of medical care against Defendants Chaney and Cravey, First Amendment retaliatory transfer claim, and Fourteenth Amendment due process claim. The only claim recommended for trial is the Eighth Amendment failure to protect claim for nominal damages only against Defendants Danforth, Zanders, McLoud, Wilcox, Jordan-Thomas, Taylor, and Bell.

SO REPORTED and RECOMMENDED this 8th day of February, 2019, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA